UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| DAWN M. HUNTLEY, | ) |
| Plaintiff, | ) 3:05-cv-126 JWS |
| vs. | ) ORDER FROM CHAMBERS |
| JO ANNE B. BARNHART,<br>Commissioner of Social Security, | ) [Re:  Motion at Docket 10] |
| Defendant. | ) |

## I. MOTION PRESENTED

Dawn M. Huntley filed a claim for Social Security Disability benefits and Supplemental Security Income ("SSI") payments in April of 2001,[1] alleging she had been unable to work since August 24, 2000, due to fatigue and body aches.[2] The Regional Commissioner for the Social Security Administration ("SSA")[3] denied her claim and so did an administrative law judge ("ALJ").[4] Huntley requested that the Social Security Appeals Council review the ALJ's decision, but the council turned her down.[5]

---

[1]Doc. 6, Administrative Record ("A.R."), p. 262.

[2]*Id.*, p. 80.

[3]*Id.*, p. 26.

[4]*Id.*, p. 16.

[5]*Id.*, p. 5.

On June 7, 2005, Huntley filed a complaint in this court challenging the ALJ's decision. At docket 10, she has filed a motion seeking reversal of the ALJ's decision and remand to the SSA for disbursement of disability benefits and SSI payments. At docket 11, Jo Anne B. Barnhart, Commissioner of Social Security, has filed an opposition to Huntley's motion. At docket 12, Huntley has filed a reply in support of her motion. Oral argument has not been requested and would not assist the court.

## II. BACKGROUND

### A. Huntley's Medical History

### 1. Reports of Treating Physicians

The first physician to treat Huntley for the ailments that form the basis of her claim was William H. Bell, who saw Huntley between February and July of 2000. During that time, his notes show she reported depression and feeling "tired all the time" and wanting "to sleep all the time on weekends."[6] Bell thought she had an "[i]nflammatory autoimmune disease."[7]

The second physician to treat Huntley was Michael B. Armstrong, a specialist in rheumatology, who first saw her on June 21, 2000. At that visit, he described her "[m]ost prominent symptoms" as fatigue and body pain for the past three years, a "low-grade fever" for the past year, and disturbed sleep for an unspecified amount of time.[8] He also recorded her problems performing "[w]ork-related activities" and her accentuated "aching" for one or two days after an increase in physical activity.[9] He examined her but found no "tender points," which he thought "preclude[d] the diagnosis of fibromyalgia," but he also concluded the symptoms she was presenting were "highly suggestive" of that disease and prescribed Plaquenil to treat it.[10]

---

[6]*Id.*, pp. 135-36, 138.

[7]*Id.*, p. 135.

[8]*Id.*, p. 173.

[9]*Id.*

[10]*Id.*, p. 175.

-2-

On September 8, 2000, Armstrong reported that since Huntley began taking Plaquenil, she had "had some 'good days' with little or no pain until about a week ago when symptoms recurred in a fluctuating fashion with fatigue and stiffness as well as pain limiting her ability to work."[11] After examining her and discovering "[o]nly 2 fibromyalgia tender points," he noted "[h]er clinical presentation is suggestive of fibromyalgia although lacking more tender points makes the diagnosis less attenuous."[12]

Armstrong continued to treat Huntley through spring of 2003. His notes from that period show Huntley reported sleeping problems, fatigue, muscle aches, and difficulty concentrating.[13] She also described her struggles with daily activities, such as her need to take two or three days to recover from doing two loads of laundry.[14] One note, dated February 19, 2003, indicates Huntley had "begun [an] oil painting class."[15]

Besides Armstrong's treatment notes, the record also includes three letters he wrote and one questionnaire he filled out on Huntley's behalf. The first letter is dated November 10, 2000, and addressed to "To Whom It May Concern." Armstrong wrote he had seen Huntley "for evaluation of symptoms of diffuse pain [and] fatigue" and confessed that the cause of those symptoms was "uncertain, although possibilities include fibromyalgia, as well as chronic fatigue syndrome."[16] He closed the letter with his "considered medical opinion that [Huntley] is not able to fulfill the requirements of her position as a social worker with the State of Alaska due to her medical illness."[17]

Armstrong's next letter is dated December 11, 2001, and addressed to the State of Alaska's Disability Determination Unit. He listed "her most troublesome symptoms"

---

[11]*Id.*

[12]*Id.*

[13]*Id.*, pp. 170-71, 189.

[14]*Id.*, p. 170.

[15]*Id.*, p. 187.

[16]*Id.*, p. 172.

[17]*Id.*

as "[r]educed stamina[,] difficulty concentrating and maintaining focus on intellectual activities[, and] distal extremity aching."[18] He repeated much of what is recorded in his treatment notes, but he also gave new information: Huntley avoided stairs, being on her feet more than a half hour and sitting more than two hours, but she was able "to drive from Homer to Anchorage with one or two stops."[19] Armstrong also noted several drugs failed to relieve her symptoms.[20] Based on those observations, his "impression" of her condition was she suffered from Hashimoto's thyroiditis and had a "[h]istory of chronic fatigue, low-grade fever and myalgias possibly related to [her thyroiditis]."[21]

Armstrong's third letter is dated June 17, 2003, and addressed to the director of the State of Alaska's Public Employees Retirement System. He wrote he was treating Huntley for "fibromyalgia with dominant symptoms of neck, shoulder, hand, hip, and arm pain continuous in these areas, 8 out of 10 in severity with disturbed and non[-]restorative sleep."[22] He also noted her sleeping problems had "somewhat improved with Zanaflex," but she continued to deal with fatigue, "difficult[y] concentrating and impaired short-term memory."[23]

The questionnaire Armstrong filled out is a "physical residual functional capacity questionnaire" dated January 28, 2004. He described Huntley's diagnosis as fibromyalgia, and her symptoms as fatigue, pain, and an "abnormal tender point exam."[24] He also noted stress exacerbates her symptoms and functional limitations and her symptoms prevented her from doing even "low-stress" jobs because they

---

[18] *Id.*, p. 139.

[19] *Id.*, p. 140.

[20] *Id.*, p. 139.

[21] *Id.*, p. 141.

[22] *Id.*, p. 224.

[23] *Id.*

[24] *Id.*, p. 217.

-4-

"constantly" interfered with her ability to concentrate on "even simple work tasks."[25] With her hindrances, Armstrong concluded Huntley could sit "about 4 hours" in an eight-hour workday and stand or walk "less than 2 hours," occasionally lift less than ten pounds, rarely lift ten pounds, and never lift twenty or more pounds.[26] He estimated she would miss work more than four days per month.[27]

## 2. DDS Physician's Report

On January 13, 2002, someone the record identifies only as a "DDS physician" signed a form assessing Huntley's residual functional capacity. That person concluded Huntley could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand or walk at least two hours and sit about six hours in an eight-hour workday.[28]

## B. Testimony at the Hearing on January 6, 2004

## 1. Huntley's Testimony

At a hearing before an ALJ on January 6, 2004, Huntley testified the last times she worked were the summers of 2001 and 2002. Each of those summers she spent ninety days aboard a ninety-foot salmon tender her husband operated in Prince William Sound.[29] She could not do "regular" deckhand work because the hours and physical demands were too much for her.[30] But during the "brief period[s] of time" when a regular deckhand was absent for some reason, she would help out by writing down weights of fish as they came aboard and by driving the boat, which were jobs she performed sitting down.[31] Recording fish weights consumed two hours of her day and

---

[25] *Id.*, pp. 217-18.

[26] *Id.*, pp. 218-19.

[27] *Id.*, p. 220.

[28] *Id.*, p. 143.

[29] *Id.*, p. 265.

[30] *Id.*, pp. 265, 270.

[31] *Id.*, pp. 265-66, 271-72.

-5-

driving the boat took four hours.[32] Some days, she would do both jobs for a work day of six hours, but on those days she would nap between jobs.[33] Living on the boat was "a little bit more comfortable" than living at home in Seward, Alaska, because she did not cook or clean and sleeping was more comfortable due to the boat's movement, which made it easier on her muscles.[34]

Huntley also testified about her last full-time job, a social worker with the State of Alaska. By February of 2000, she was feeling so tired that, at a doctor's suggestion, she took a couple weeks off work.[35] She did that and felt better, but by August of 2000 she could "barely make it to work" and would close her office door and lie on the floor because of her fatigue and pain.[36] Eventually, she could not make it to work and, at that point, she did case work in bed.[37] She took medical leave some time after August of 2000 and resigned in January of 2001.[38]

A third topic Huntley discussed was her comfort level with daily activities. She testified she can vacuum a six-foot by eight-foot section of the trailer in which she and her husband reside in Seward and do the dishes but cannot keep up with the laundry and dusting or even make the bed.[39] She gets out of bed most days, but not every day, especially on days when she has "overdone it the day before."[40] As an example of overdoing it, she cited riding a snow machine with her husband "for about an hour."[41]

---

[32]*Id.*, p. 272.

[33]*Id.*, p. 273.

[34]*Id.*, pp. 274-75

[35]*Id.*, pp. 266-67.

[36]*Id.*, pp. 266-67, 278.

[37]*Id.*, p. 267.

[38]*Id.*

[39]*Id.*, pp. 276, 280-81.

[40]*Id.*, p. 281.

[41]*Id.*, pp. 281-82.

Huntley also talked about her sleeping problems. She testified she does not sleep well unless she takes Zanaflex, which relaxes her muscles.[42] If she does not take Zanaflex, she cannot sleep and her condition deteriorates until she "basically can't move."[43] Besides the physical ailments associated with her sleeping problems, Huntley also testified those problems caused her mental distress. When she gets tired her eyes will not focus and she cannot maintain a train of thought.[44] That also happens when she comes under "[a]ny type of stress."[45]

Huntley briefly touched on three other topics. One topic was her time at a mining camp in the Bush north of Fairbanks, Alaska, in the summer of 2003. She testified she did not work at the mining camp,[46] which is consistent with one of her letters in the record in which she wrote she was unable to cook for the men in the camp.[47] The second topic was a letter she wrote to Armstrong in November of 2000, which contained the sentence, "While I [Huntley] know I am not totally disabled, I also know I cannot continue to do the job I am doing, either."[48] She explained she did not consider herself "totally disabled" because she did not like to think of herself as "unable to do anything."[49] The third topic was her pain. She testified she suffered pain "throughout [her] body" and felt like she has the flu all the time.[50]

---

[42] *Id.*, p. 276.

[43] *Id.*

[44] *Id.*, pp. 278-79.

[45] *Id.*, p. 279.

[46] *Id.*, p. 285.

[47] *Id.*, p. 56.

[48] *Id.*, p. 203.

[49] *Id.*, p. 279.

[50] *Id.*, pp. 277, 280.

Case 3:05-cv-00126-JWS   Document 13   Filed 03/24/06   Page 7 of 16

**2. Vocational Expert Testimony**

Robert M. Sullivan testified as a vocational expert, but his testimony was limited to listing Huntley's past jobs and describing each job by its exertional demands and skill level, according to the Dictionary of Occupational Titles.[51]

**C. ALJ's Decision**

In deciding whether Huntley is disabled, the ALJ ran through the first four steps of the "five-step sequential evaluation process" set forth at 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). At the first step, the ALJ concluded Huntley "has not engaged in substantial gainful activity since the alleged onset of [her alleged] disability."[52] Second, the ALJ determined Huntley suffers from fibromyalgia and that her fibromyalgia is a "severe impairment."[53] Third, the ALJ decided the severity of Huntley's fibromyalgia did not "meet or medically-equal any of the listed impairments" in SSA regulations.[54] Fourth, the ALJ found Huntley could perform all her "past relevant work."[55] Based on that finding, the ALJ concluded Huntley was not disabled[56] and did not proceed to step five, which asks whether Huntley could perform other work besides her past work.

As part of the ALJ's analysis, the ALJ discredited Huntley's testimony about her "symptoms and limitations" because she: 1) "spent the summers in 2001 and 2002 working as a deck hand for as many as 90 days in a row on a fishing boat"; 2) "planned to live in the [B]ush north of Fairbanks" in the summer of 2003; 3) "requested that Dr. Armstrong fill out disability forms even though she knew she was 'not totally

---

[51] *Id.*, pp. 283-84.

[52] *Id.*, p. 23.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*, p. 24.

disabled'"; and 4) "reported constant pain that was eight on a scale of one to ten, yet could take oil painting classes and drive several hours from Homer to Anchorage."[57]

The ALJ also rejected some of Armstrong's opinions. The ALJ wrote, "Armstrong opined that [Huntley] has fibromyalgia and filled out a form with his opinions of [her] limitations," but then dismissed "these conclusions" as "simply boxes that [Armstrong] marked without providing objective medical evidence to support his opinions."[58] Next, the ALJ criticized "[t]he majority of Dr. Armstrong's treatment notes [as] simply [Huntley's] subjective reports in support of her litigation efforts to obtain disability benefits."[59] The ALJ also derided Armstrong's notes as "contain[ing] contradictory statements about [Huntley's] condition and diagnosis," contrasting Armstrong's June 21, 2000 statement about the absence of tender points precluding a fibromyalgia diagnosis with his January 28, 2004 diagnosis of fibromyalgia and finding of abnormal tender points.[60]

After discrediting Huntley's testimony and rejecting Armstrong's opinions, the ALJ characterized the vocational expert as having testified Huntley "could return to all of her past relevant work"[61] and found Huntley could do light work, all her past relevant work was light and, therefore, she could do all her past relevant work.[62]

### III. STANDARD OF REVIEW

This court must "uphold the [ALJ's] decision denying benefits if the [ALJ] applied the proper legal standard and there is substantial evidence in the record as a whole to

---

[57] *Id.*, p. 20.

[58] *Id.*

[59] *Id.*

[60] *Id.*, pp. 20-21.

[61] *Id.*, p. 23.

[62] *Id.*, pp. 22-23.

-9-

support the decision."[63] Substantial evidence is "more than a mere scintilla, but less than a preponderance."[64]

## IV. DISCUSSION

### A. The ALJ Improperly Discredited Huntley's Testimony

The test courts use to evaluate credibility decisions by ALJs is known as the *Smolen* or *Cotton* test.[65] That test's first step requires claimants to "produce objective medical evidence of [an] underlying 'impairment,' and ... show that the impairment ... 'could reasonably be expected to produce pain or other symptoms.'"[66] If claimants make it past the first step and they are not malingerers, then an ALJ may reject their "testimony about [the] severity of [their] symptoms [only] with 'specific findings stating clear and convincing reasons'"[67] that are based on "substantial evidence."[68]

The disease from which Huntley suffers, fibromyalgia, makes it impossible to apply *Smolen/Cotton*'s first step because, as the Ninth Circuit noted in *Benecke v. Barnhart*, it "eludes [objective] measurement."[69] The *Benecke* court emphasized that point by noting that diagnosing fibromyalgia depends "entirely on ... patients' reports of pain and other symptoms ... [because] there are no laboratory tests to confirm the diagnosis."[70] To this court's knowledge, the Ninth Circuit has not addressed the

---

[63]*Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986)).

[64]*Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

[65]*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1405 (9th Cir. 1986)).

[66]*Id.* (quoting *Smolen*, 80 F.3d at 1281-82).

[67]*Id.* (quoting *Smolen*, 80 F.3d at 1284).

[68]*Id.* at 1197.

[69]379 F.3d 587, 594 (9th Cir. 2004) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)) (alteration added).

[70]*Id.* at 590 (citations omitted).

-10-

consequence of fibromyalgia's incompatibility with the first step of the *Smolen/Cotton* test. In the absence of the circuit court's guidance, this court will excuse Huntley from having to meet that step because the fact she suffers from a disease for which there is no objective measurement should not be held against her.

Turning to the *Smolen/Cotton* test's second step, there is no evidence that Huntley is a malingerer and so the question is whether the ALJ's reasons for discrediting her testimony were clear, convincing, and based on substantial evidence. None of the ALJ's reasons meets that standard.

The ALJ's first reason, that Huntley "spent the summers in 2001 and 2002 working as a deck hand for as many as 90 days in a row on a fishing boat," is not convincing because it is not accurate. The record shows Huntley could not perform regular deckhand work and instead only took on chores involving minimal physical exertion on the rare occasions a deckhand was absent.

The ALJ's second reason, that Huntley "planned to live in the [B]ush north of Fairbanks" in the summer of 2003, is not clear. The ALJ does not explain why planning to live in the Bush is inconsistent with Huntley's testimony, and there is no obvious inference to draw from that fact. One possible inference is that Bush living would be less comfortable for Huntley than living elsewhere, but the record contains no evidence on that issue. And, making an assumption about the correct inference to draw from the ALJ's reason only emphasizes its lack of clarity.

The ALJ's third reason, Huntley's "request[] that Dr. Armstrong fill out disability forms even though she was 'not totally disabled,'" refers to Huntley's November of 2000 letter to Armstrong. It is true Huntley asked Armstrong to fill out disability forms and said she was "not totally disabled." But, the ALJ's suggestion that Huntley was scheming to get undeserved benefits finds no support in her letter. The full sentence from which the ALJ quoted was, "While I [Huntley] know I am not totally disabled, I also know I cannot continue to do the job I am doing, either." Far from being evidence of dishonesty, Huntley's feeling she could not perform her job shows her efforts at obtaining disability benefits were in good faith. Furthermore, her explanation at the hearing that by "not totally disabled" she meant she did not consider herself "unable to

-11-

do anything" is consistent with the law.  As the Ninth Circuit noted in *Vertigan v. Halter*, "[o]ne does not need to be 'utterly incapacitated' in order to be disabled."[71]

The ALJ's fourth reason, that Huntley "reported constant pain that was eight on a scale of one to ten, yet could take oil painting classes and drive several hours from Homer to Anchorage," seeks to impeach Huntley's pain testimony with her statements about her physical activities.  If Huntley was "able to spend a substantial part of [her] day[s] engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit [her] allegations."[72]  That finding is required because "the mere fact [she] carried on certain daily activities ... does not in any way detract from [her] credibility as to [her] overall disability."[73]  Also, some activities "are not necessarily transferable to the work setting ... [because she may have done them] *despite* pain for therapeutic reasons," but be unable to overcome the pain to concentrate on work.[74]  Here, the ALJ noted Huntley's undertaking of two pursuits involving physical functions without finding she spent substantial parts of her days doing them and the functions were transferable to a work setting.  Without that finding, the ALJ's fourth reason for discrediting Huntley's testimony is not convincing.

That reason suffers another defect, too.  It gives the impression Huntley was driving and painting contemporaneously with experiencing severe pain, but the record does not support that impression.  It shows Armstrong reported Huntley's driving in a December 11, 2001 letter, her painting in his February 19, 2003 treatment notes, and her pain in a June 17, 2003 letter.  Thus, Huntley's driving and painting were not contemporaneous with her pain, but instead occurred one-and-a-half years and four months, respectively, beforehand.

---

[71]260 F.3d at 1050 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

[72]*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603).

[73]*Vertigan*, 260 F.3d at 1050.

[74]*Id.* (emphasis in original).

Case 3:05-cv-00126-JWS   Document 13   Filed 03/24/06   Page 12 of 16

Because the ALJ erred in discrediting Huntley's testimony, the court credits it as true.[75]

**B. The ALJ Improperly Rejected Armstrong's Opinions on Huntley's Functional Limitations**

Because Armstrong was Huntley's treating physician, the ALJ may reject his opinions "only for 'clear and convincing' reasons supported by substantial evidence in the record" if his opinions are "not contradicted by another doctor."[76] And "[e]ven if [his] opinion[s are] contradicted by another doctor, the ALJ may not reject [them] without providing 'specific and legitimate reasons' supported by substantial evidence in the record."[77] These standards apply to Armstrong's medical opinions about the nature of Huntley's impairment and his opinions about the effects of that impairment on her functional capabilities.[78]

The ALJ rejected Armstrong's opinions after a confusing discussion. The discussion's first problem was that the ALJ seemed to criticize both Armstrong's opinion that Huntley suffers from fibromyalgia and his opinion about the extent to which that condition limits her ability to work. Given the ALJ's conclusion at step two of the disability analysis that Huntley suffers from fibromyalgia, the court will presume the ALJ meant to criticize only Armstrong's opinions on Huntley's functional limitations. The discussion's second problem was that the ALJ did not say whether those opinions were contradicted by another physician. This is a significant oversight because that fact determines the level of scrutiny the court applies to the ALJ's reason for rejecting Armstrong's opinions. As it turns out, however, that error is harmless because the ALJ's reason does not meet even the lesser of the two levels of scrutiny.

The ALJ rejected Armstrong's opinions about Huntley's functional limitations on the ground they were based on Huntley's "subjective reports" rather than on "objective

---

[75]*Benecke*, 379 F.3d at 594 (citations omitted).

[76]*Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Lester*, 81 F.3d at 830).

[77]*Id.*

[78]*Id.*

-13-

Case 3:05-cv-00126-JWS   Document 13   Filed 03/24/06   Page 13 of 16

medical evidence." That is not a legitimate reason because it faults Armstrong for relying on subjective reports this court has deemed credible and "effectively requir[es] 'objective' evidence for a disease that eludes such measurement."[79] The ALJ also expressed a concern about what the ALJ represented were contradictions in Armstrong's notes, but the supposed contradictions pertained to his diagnosis of Huntley's fibromyalgia and not his opinions about her functional limitations.

Because the ALJ erred in rejecting Armstrong's opinions about Huntley's functional limitations, the court credits them as true.[80]

## C. The ALJ's Decision Is Not Supported by Substantial Evidence

The ALJ's decision to deny Huntley's claim on the ground she could perform all her past work is not supported by substantial evidence. The only evidence in the record supporting that decision is the DDS physician's assessment of Huntley's residual functional capacity. But that assessment is outweighed by Armstrong's assessment because he and not the DDS physician was Huntley's treating physician[81] and his assessment does not support the ALJ's decision. Also, another piece of evidence the ALJ relied on does not actually support the ALJ's decision. Although the ALJ thought Sullivan, the vocational expert, testified Huntley "could return to all of her past relevant work," Sullivan did not say that. His testimony simply described Huntley's past work experience and what the Dictionary of Occupational Titles says about those jobs.

## D. The Appropriate Remedy Is To Remand Huntley's Claim to the SSA for Further Proceedings

In *Harman v. Apfel*, the Ninth Circuit noted that "[i]n cases where the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence, [the circuit court] consistently [has] remanded for

---

[79] *Benecke*, 379 F.3d at 594 (quoting *Green-Younger*, 335 F.3d at 108) (alteration added).

[80] *Id.* (citations omitted).

[81] *Reddick*, 157 F.3d at 725 (citing *Lester*, 81 F.3d at 830).

-14-

further proceedings rather than payment of benefits."[82] Here, no vocational expert testified about Huntley's limitations and so a remand for further proceedings is required.

Huntley argues a remand is not required on the ground any vocational expert, when confronted with a hypothetical based on her limitations as established by her testimony and Armstrong's opinions, inevitably would conclude she is disabled. She cites no authority recognizing an "inevitable conclusion" exception to the rule requiring remand in the absence of vocational expert testimony on a claimant's limitations. The *Harman* court did not recognize such an exception and neither does the case in which the Ninth Circuit undertook to "clarify" *Harman*.[83]

That case is *Benecke,* and the issue before the circuit court was a claimant's ability to perform sedentary jobs,[84] which are the least physically demanding jobs under the SSA's classification system.[85] If the *Benecke* claimant had not been able to do those jobs, she would not have been able to do any job and, therefore, would have been disabled. A vocational expert testified her psychological limitations prevented her from doing one sedentary job, telemarketing, but did not discuss whether they kept her from doing other sedentary jobs.[86] That oversight convinced the district court there remained an issue about the claimant's disability and that a remand for further proceedings was appropriate under *Harman*.[87] But the circuit court held otherwise, explaining a remand was unnecessary because the vocational expert's testimony, when combined with other evidence in the record, clearly established the claimant could not perform any other sedentary jobs and so was disabled.[88]

---

[82]211 F.3d 1172, 1180 (9th Cir. 2000) (citing *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1281 (9th Cir. 1987)).

[83]*Benecke*, 379 F.3d at 595.

[84]*Id.*

[85]20 C.F.R. § 404.1567.

[86]379 F.3d at 592-93.

[87]*Id.* at 595.

[88]*Id.*

Case 3:05-cv-00126-JWS   Document 13   Filed 03/24/06   Page 15 of 16

*Benecke* is not authority for remanding for benefits in this case because no vocational expert testified about Huntley's ability to do any job, let alone a sedentary one. Although her testimony and Armstrong's opinions suggest she is not able to perform any job, no vocational expert expressed an opinion on her ability to work based on that or any other evidence. Consequently, a remand for further proceedings is required.

## V. CONCLUSION

For the reasons set out above, the motion at docket 10 is **GRANTED** in part and **DENIED** in part. The ALJ's decision denying Huntley's claim for benefits is reversed, but rather than remanding her claim to the SSA for disbursement of disability benefits and SSI payments, the court hereby REMANDS her claim for further proceedings consistent with this order.

DATED at Anchorage, Alaska, this 24th day of March, 2006.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

-16-

Case 3:05-cv-00126-JWS   Document 13   Filed 03/24/06   Page 16 of 16